# IN RE BECILMAN.

PATENTS; PATENTABILITY; CLAIMS.

Where an applicant was the first to conceive and work out an idea of distant control for inking fountains in printing presses, marking a distinct and radical advance in the art, it was *held* that he was entitled to claims as broad as his invention, and should not be restricted to electric means for controlling the fountains, where competitors might, by substitution of other means, effect the same result and thus deprive the real inventor of the fruits of his discovery.

No. 1146. Patent Appeals. Submitted January 18, 1918. Decided March 4, 1918.

HEARING on an appeal from a decision of the Commissioner of Patents allowing certain narrow claims, but rejecting broad claims. *Reversed as to one claim and affirmed as to the other claims.*

The facts are stated in the opinion.

*Mr. Arthur E. Dowell* for the appellant.

*Mr. Theodore A. Hostetler* for the Commissioner of Patents.

Mr. Justice ROBB delivered the opinion of the Court:

Appeal by Henry F. Bechman from a decision of the Patent Office tribunals rejecting claims 1, 2, 3, 5, 6, 8, 9, 11, 12, 13, 15, 17, 19, 21, 22, 23, 24, 25, 27, 28, and 30 in appellant's application for patent. Claims 2 and 11 sufficiently illustrate the rejected claims and read as follows:

"2. In combination a fountain provided with a plurality of devices for regulating the supply from different points thereof, with electrically controlled means for independently operating the adjusting devices."

"11. In combination with an ink fountain having adjustable devices for regulating the amount of ink delivered by the fountain, and means for individually operating said devices; with controlling devices located at a point remote from the fountain, and connection between said controlling devices and the several operating means substantially as described."

The invention relates to a control for inking fountains in printing presses, and marks a distinct and radical advance in the art.   In his specification the appellant says: "This invention has particular reference to inking mechanism for large printing presses and other color applying machines; and its major object is to enable the amount of ink supplied from any ink fountain to be controlled by means located at any desired point remote from the fountain; and whereby different amounts of ink may be supplied by the same fountain at different points of its length, and the amount of ink supplied at any desired point in the length of the fountain roll can be increased or diminished at the will of the operator."  The specification then directs attention to the fact that heretofore the screws controlling the scraper blade of the ordinary type of ink fountains have been manipulated manually, and that in large presses the pressman has been compelled to climb to the different tiers of the press and sometimes to stop the press entirely to make the proper adjustments.  The specification continues: "My invention more specifically provides means whereby each fountain of a press, or any set of fountains, may be controlled from a central point or switchboard; and the operator, by simply pressing the proper buttons thereon, can increase or diminish the supply of ink obtained from any given fountain, at any point or section in the length of the fountain roll.  The controlling devices can be located at any convenient point, and in practice would be preferably located where the operator can observe the product of the press and can increase or diminish the supply of ink to any part of the width of the paper, or printed web, as he pleases, without having to leave the spot; and if the color on the web be too light or too heavy it can be increased or diminished practically instantly without the pressman having to leave his station or climb to upper decks of the press."  The specification

then points out that the advantage of such an electrically controlled apparatus lies in the fact that the pressman may have the switchboard located near the folder, from which point all adjustments may be made.

The first group of claims, including claim 2, was rejected because, in the opinion of the Patent Office, they are sufficiently broad to cover the adoption of a plurality of independent electric circuits and motors in connection with the machines of Goss and Spalckhaver, patents for which were granted in 1907 and 1910, respectively. These patents disclose ink fountains in which manually operated means are provided at the ends of the fountains for adjusting the individual screws. It is the view of the Patent Office that it was common practice to employ electric circuits and magnets to control mechanical motion; but it is strange, indeed, if this was so obvious, that Goss and Spalckhaver did not employ them instead of the less desirable devices they did use. However, we agree with the Patent Office that this group of claims is very general, and not drawn to cover applicant's real invention, which was a centrally located control for inking fountains. As the Assistant Commissioner said, "Applicant has devised a scheme for controlling the inking fountain from a distant point, preferably the point where the paper issues from the press." The Assistant Commissioner thereupon allowed applicant nine claims which had been disallowed by the lower tribunals. But in the allowed claims applicant was restricted to electric means for controlling the fountains. We do not think he should be thus limited. He is the first to conceive and work out the idea of distant control, and should be given a claim as broad as his invention. Obviously, his claims ought not to be so narrowed as to invite competitors, by substitution of other means, to effect the same result and thus deprive the real inventor of the fruits of his discovery. We think the allowance of claim 11, or of a claim or claims of equal breadth, will accomplish the desired end.

The decision is reversed as to claim 11, but affirmed as to the other claims involved.